FILED
2014 Oct-02  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **ERVINE ROMINE, d/b/a Romine's Cane Creek Grill,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: No. 1:12-3787-VEH** |
| ) | |
| **CITY OF ANNISTON, ALABAMA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

Plaintiff Ervine Romine ("Mr. Romine") initiated this civil rights lawsuit against Defendants City of Anniston (the "City"), Mayor Gene Robinson ("Mayor Robinson"), in his individual capacity, and City Manager Don A. Hoyt ("City Manager Hoyt"), in his individual capacity, on November 2, 2012, arising out of his loss of a lease to run the Cane Creek Grill located on the Cane Creek Golf Course in Anniston, Alabama. (Doc. 1 at 1; *id.* at 3 ¶ 2). Mr. Romine's complaint contains three counts.

Count One is for race discrimination under 42 U.S.C. § 1981 by and through § 1983. (*Id.* at 10-12 ¶¶ 39-49). Count Two is for equal protection and due process

violations under the Fourteenth Amendment. (*Id.* at 12-14 ¶¶ 50-63). Finally, Count Three is for breach of contract under Alabama law. (*Id.* at 14-15 ¶¶ 64-70).

Pending before the court is Defendants' Motion for Summary Judgment (Doc. 26) (the "Rule 56 Motion") filed on March 24, 2014. The parties have briefed the Rule 56 Motion and it is now fully under submission. (Docs. 27, 34-36, 41).

Also pending is Mr. Romine's Motion To Strike (Doc. 37) (the "Strike Motion") filed on May 7, 2014. Defendants opposed (Doc. 41) the Strike Motion on May 28, 2014, and  no reply from Mr. Romine was filed.

For the reasons explained below, Defendants' Rule 56 Motion is due to be granted. Mr. Romine's Strike Motion is due to be termed as moot.

## II.    FACTUAL BACKGROUND[1]

### Facts Leading Up To The Clubhouse Restaurant Lease Between Mr. Romine And The COA

Mr. Romine has been a business owner in the COA for over twenty-five years, having operated the Annistonian Restaurant as well as other restaurants and stores.

---

[1]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party).This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

AF No. 1.[2] Long before the key events of this lawsuit, the COA purchased the Cane Creek Golf Course, which facility included a clubhouse with a separate space for a restaurant. AF No. 2. On February 8, 2007, the COA contracted with Mark Spaulding ("Mr. Spaulding") to lease and operate a restaurant at the Cane Creek Golf Course. AF No. 3. Mr. Spaulding voluntarily terminated this lease in November 2009. *Id.*

After Mr. Spaulding's departure, the COA managed the golf course and restaurant by and through its Parks and Recreation Manager, Steven Folks ("Mr. Folks"). AF No. 4. In December of 2009, the COA publicized notice of its intention to accept requests for qualifications ("RFQs") from applicants who desired to bid on operation of the restaurant facility and potentially become a new lessee. AF No. 6.

---

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Mr. Romine has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under appendix II of the court's uniform initial order (Doc. 10) entered on December 13, 2012, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Romine, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Romine has inadequately asserted a dispute over a fact that Defendants have otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports Defendants' factual assertion, has accepted Defendants' fact. On the other hand, whenever Mr. Romine has adequately disputed a fact offered by Defendants, the court has reviewed the evidence cited by Mr. Romine and, if it in fact fairly supports Mr. Romine's factual assertion, has accepted Mr. Romine's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of undisputed facts as set forth in Doc. 27 and responded to by Mr. Romine in Doc. 35. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 19.2) would indicate the second sentence of paragraph 19 of Defendants' statement of facts is the subject of the court's citation to the record. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Although four or five people initially indicated that they were interested in running the restaurant through their attendance at a pre-bid meeting, Mr. Romine, who is African American, submitted the only bid in February of 2010. AF No. 7; (Doc. 34-6 at 1 ¶¶ 2, 3). The City Council for the COA had Mr. Romine's bid on the agenda for many meetings, including one on March 9, 2010, March 23, 2010, April 27, 2010, and May 25, 2010. (Doc. 34-6 at 1¶ 4). At the meeting held on June 22, 2010, the City Council authorized City Manager Hoyt to negotiate a lease agreement with Mr. Romine for the operation of the restaurant. (Doc. 34-6 at 1¶ 4).

### Execution And Terms Of The Clubhouse Restaurant Lease Between Mr. Romine And The COA

On August 24, 2010, Mr. Romine signed a three year lease with the COA. City Manager Hoyt signed the lease on behalf of COA. The term of the lease was scheduled to begin on September 1, 2010, and end on August 30, 2013.

The lease required Mr. Romine to pay quarterly installments towards the annual rent of $6,600.00, with the first $1,650.00 payment due on September 1, 2010. (Doc. 26-7 at 3 ¶ 3).[3] The lease's default provision further permitted the COA to declare default for the nonpayment of rent. (*Id*. at 3, 15 ¶¶ 3, 17).

Another part of the lease provided that "[e]xcept for the prior written

---

[3]  All page references to Doc. 26-7 correspond with the court's CM/ECF numbering system.

permission of the [City], through its City Manager, the [Plaintiff] shall at all times during the lease term, have the premises open, staffed, and available for food and beverage service," and that "failure to do so shall constitute a ground of default under the terms of this lease agreement." (Doc. 26-7 at 5 ¶ 5). However, Mr. Romine testified that City Manager Hoyt knew that this provision was unreasonable given the short duration of time (*i.e.*, only one week) between the parties' execution of the lease on August 24, 2010, and the beginning of the term on September 1, 2010. (Doc. 26-3 at 20 at 75-76).[4]

Additionally, the lease mandated Mr. Romine to have commercial liability, property, and liquor liability insurance and that "[c]ertified copies of all such policies shall be made available to the City of Anniston upon entering into this lease agreement." (Doc. 26-7 at 11 ¶7).

The lease further obligated Mr. Romine to "at all times" have and maintain all required liquor licenses. (Doc. 26-7 at 5 ¶ 4). During his deposition, Mr. Romine questioned the feasibility of this particular requirement by pointing out that the COA did not approve his liquor license until September 28, 2010. (Doc. 26-3 at 20 at 76).

The lease provided that any "[f]ailure by [the City] to enforce any provision of

---

[4] The first set of page references to Doc. 26-3 corresponds with the court's CM/ECF numbering system.

this lease shall not work as a forfeiture of [the City's] right to enforce any provision of this lease at any time." AF No. 16; (Doc. 26-7 at 15 ¶17). Finally, the lease stated that "[i]t is understood and agreed that this instrument constitutes the entire agreement between the parties hereto and that any changes or alterations hereunder must be made in writing, duly executed by and parties hereto, and attached to this instrument." AF No. 17; (Doc. 26-7 at 16 ¶ 20).

### Facts Post-Dating The Execution Of The Clubhouse Restaurant Lease Between Mr. Romine And The COA

On August 27, 2010, City Manager Hoyt informed the City Council in an email message that Mr. Romine had experienced problems acquiring the required insurance coverages and licenses, but that Mr. Romine had assured him that he would have all these items in place when the term of the lease began on September 1, 2010. (Doc. 26-1 at 17, 18, 61-62, 66).[5] City Manager Hoyt did not share with the City Council in this electronic communication that the lease had only just been signed 3 days earlier. (Doc. 34-2 at 78).[6]

Mr. Romine did not pay the first quarterly payment of $1,650.00 due on September 1, 2010. AF No. 19.1; (*see* Doc. 26-3 at 12 at 43 ("I agree that it was, you

---

[5]  The first set of page references to Doc. 26-1 corresponds with the court's CM/ECF numbering system.

[6] All page references to Doc. 34-2 correspond with the court's CM/ECF numbering system.

know, September 1st, but when I asked him [*i.e.*, City Manager Hoyt] about that, it was after the 1st.")). However, Mr. Romine testified that City Manager Hoyt told him that he could postpone making the first installment payment until he had gotten into the building. (Doc. 26-3 at 12 at 43-44).

Mr. Romine also had neither obtained the necessary policies of commercial liability, property, and liquor liability insurance, nor a liquor license by September 1, 2010. AF No. 19.2. However, Mr. Romine testified that he was not able to acquire the various insurance policies until after he had received a copy of the executed lease. (Doc. 26-3 at 20 at 76).

As for the delay in obtaining his license to sell alcohol, Mr. Romine pointed out during his deposition that it was the COA which did not approve his application for forwarding to the ABC Board until the end of September 2010. (Doc. 26-3 at 20 at 76; *see also* Doc. 34-6 at 4 ¶ 11 ("I made application for my Liquor License on September 16, 2010 and the city did not approve my application and forward it to the ABC Board until September 29, 2010.")).

Mr. Folks continued to operate the restaurant on behalf of COA during this interim time period. (Doc. 26-4 at 3-4; Doc. 26-6 at 5-6 ¶ 14). Mr. Romine testified that he did not get cooperation from COA personnel in securing maintenance records (Doc. 26-3 at 66 at 18), that he was treated with disrespect, and that he was ignored

when he needed something for the building. (Doc. 34-7 at 17-18).[7]

After signing the lease on August 24, 2010, Mr. Folks indicated that all Mr. Romine did with respect to getting the restaurant ready "was having a warming buffet table delivered, having an electrical contractor to install one 220 volt wall socket, and . . . [having] someone to remove carpet and replace[] [that] very small area of the restaurant [with tile.]" (Doc. 26-4 at 4).

Mr. Romine counters that Mr. Folks's recollection is an understatement as he proceeded to obtain: (i) commercial property coverage effective September 30, 2010, to September 30, 2011; (ii) liquor liability coverage effective September 10, 2010, to September 10, 2011; and (iii) an Alcohol Beverage License from the Alcohol Beverage Control Board, which became effective on October 25, 2010. (Doc. 34-6 at 3-4 ¶¶ 12, 14). Mr. Romine also met with the Health Department and made necessary upgrades to the restaurant. (Doc. 34-7 at 7). Mr. Romine further had menus printed up and paid for grand opening advertising. (Doc. 26-3 at 19 at 70; *id.* at 20 at 74-75).

City Manager Hoyt testified about a document dated October 21, 2010, which attempted to modify certain portions of the restaurant lease while it left other provisions unchanged. (Doc. 26-1 at 15-16 at 55-60). City Manager Hoyt indicated

---

[7]  All page references to Doc. 34-7 correspond with the court's CM/ECF numbering system.

that he could not "recall the exact differences[,]" but thought that the "food sales" and "minimum menu may have been changed." (Doc. 26-1 at 16 at 57, 58). No underlying document, such as, for example, a copy of the City Council's minutes, confirms that it voted to have City Manager Hoyt modify the terms of the previously executed lease. Instead, City Manager Hoyt indicated that he understood that he had this authority from the City Council's original vote and that he did not "see that as a barrier to making minor changes [to the original lease]." (*Id.* at 16 at 59). Mr. Romine did not ever sign this amended lease. AF No. 26.3.

On November 4, 2010, City Manager Hoyt reported to the City Council in a written memorandum that Mr. Romine "has been out of compliance with his lease since the day it was signed." (Doc. 26-8 at 2).[8] City Manager Hoyt made it clear in this communication to the City Council that the lease had not been executed until August 24, 2010. (*Id.* at 3). City Manager Hoyt further indicated in this correspondence that "unless somebody has a better idea, I'm going to hand deliver a default notice to Mr. Romine tomorrow." (*Id.* at 3). The City Council never formally voted to default Mr. Romine under the lease and never consulted with the City Attorney, Cleo Thomas, about Mr. Romine's defaulted status. (Doc. 35 at 12 ¶¶ 31-32).

---

[8]  All page references to Doc. 26-8 correspond with the court's CM/ECF numbering system.

On or about November 5, 2010, the COA, through City Manager Hoyt, delivered Mr. Romine a default notice dated November 4, 2010. AF No. 30; (Doc. 26-9 at 2). This notice identifies 7 terms of the restaurant lease in which the COA contends Mr. Romine has "been out of compliance . . . since September 1, 2010, the day you were supposed to open for business." (Doc. 26-9 at 2). The listed provisions include: (i) being open for business; (ii) acquiring and maintaining all necessary licenses and permits; (iii) holding a Restaurant Liquor License; (iv) operating a fully supplied beverage cart on the golf course; (v) maintaining a public liability insurance policy; (vi) providing certified copies of all such policies to the COA upon entering into the lease agreement; and (vii) paying rent in quarterly installments. *Id.* The notice also indicates that "the Council may entertain a reasonable monetary settlement for the expenses that [Mr. Romine] incurred in [his] attempts to comply with the agreement." *Id.* Finally, the notice invites Mr. Romine to make a subsequent bid. *Id.*

Mr. Romine disputes the legitimacy of grounds relied upon by the COA for issuing the default notice and offers several explanations for his inability to meet the referenced terms of the lease by September 1, 2010. (*See, e.g.*, Doc. 35 at 23 (pointing out that lease was not finally executed until August 24, 2010, and that by "November 4, 2010, [Mr. Romine] had all the necessary insurance, had provided the [COA] with proof thereof in October of 2010, and had his liquor license")).

10

Neither Mayor Robinson nor the City Council ever took steps to rescind this termination notice delivered to Mr. Romine by City Manager Hoyt. Mr. Romine did not submit any requests for reimbursement from the COA immediately after his lease was terminated. However, as of November 3, 2011, the COA (through its insurance carrier) acknowledged Mr. Romine's race discrimination claim relating to the ending of his lease. (Doc. 34-9 at 2).[9]

On June 29, 2011, the COA, once again, requested bids to operate a restaurant on the golf course property. AF No. 36. Mr. Romine did not submit a bid, but three other people did. *Id.* The COA selected Rocco Gomez ("Mr. Gomez") (a Mexican-American) and executed a lease with him on September 29, 2011. AF No. 37. At some point in 2013, Mr. Gomez's lease was, with the COA's consent, assigned to Chandler Wilborn (a white male) ("Mr. Wilborn") and Hunter LeCroy (a white male) ("Mr. LeCroy"). (*See* Doc. 34-10 at 2 ¶ 3 ("In the late Summer or early Fall of 2013, I approached Steven Folks, the Director of Parks and Recreation for the City of Anniston, and asked him whether the City would allow me to assign the [restaurant] lease to a qualified applicant.")).[10]

---

[9] All page references to Doc. 34-9 correspond with the court's CM/ECF numbering system.

[10] All page references to Doc. 34-10 correspond with the court's CM/ECF numbering system. Also, while Doc. 34-10 (Mr. Gomez's affidavit executed on March 31, 2014) references two attachments (Doc. 34-10 at 3 ¶ 6), including a copy of the Assignment, Assumption, and Modification Agreement, neither appears electronically on CM/ECF, which is the official court file.

## III.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

**B.     Qualified Immunity**

Both individual defendants assert that qualified immunity bars Mr. Romine's § 1983 claims brought against them in their personal capacities in Counts One and Two. (Doc. 27 at 19-20).[11] "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id*.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id*. at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."

---

[11]  All page references to Doc. 27 correspond with the court's CM/ECF numbering system.

*Cottone*, 326 F.3d at 1358.[12]

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the individual defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[13] *Anderson v.*

---

[12] Here, there is no dispute over whether the individual defendants were all acting within the scope of their discretionary authority. (*See* Doc. 35 at 20 (absence of any contention by Mr. Romine that either Mayor Robinson or City Manager Hoyt acted without discretionary powers)).

[13] Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In

*Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing

*Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271

(1986)). Therefore, a temporal requirement exists related to this inquiry. More

particularly, a plaintiff must show that a reasonable public official would not have

believed her actions to be lawful in light of law that was clearly established at the

time of the purported violation. *See Anderson*, 483 U.S. at 639,107 S. Ct. at 3038

("[W]hether an official protected by qualified immunity may be held personally liable

for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly

established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted);

*Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583

(2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct

would violate the Constitution, the officer should not be subject to liability or, indeed,

even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125

S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her

conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the</u>

<u>time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087,

---

this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

16

### C.     Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard." *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517, 139 L. Ed. 2d 508  (1997). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* Fed. R. Evid. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry*, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee the party appealing a new trial. Instead, such erroneous rulings by a district court must "affect the

substantial rights of the parties" for reversible error to occur.

## IV.    ANALYSIS

### <u>Defendants' Rule 56 Motion</u>

#### A.    Mr. Romine's Federal Claims

##### 1.    Federal Claims Asserted Against Mayor Robinson and City Manager Hoyt In Their Official Capacities

A § 1983 claim against a person in his official capacity seeks to impose liability on the entity which he represents, and not on him personally. *See, e.g., Welch v. Laney*, 57 F.3d 1004, 1008 (11th Cir. 1995) ("Welch's action against the Sheriff and Chief Deputy Sheriff in their official capacities imposes liability on the entity they represent, and not on them as individuals." (citing *Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S. Ct. 873, 877-78, 83 L. Ed. 2d 878 (1985))). As the Eleventh Circuit has explained the distinctions between these two capacities in more detail:

> "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. <u>Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'</u>" *Id.* at 165-66, 105 S. Ct. at 3105 (citations omitted) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 2035 n.55, 56 L. Ed. 2d 611 (1978)). In other words, a plaintiff in an action against a government official in his personal capacity can recover only against the official's personal assets. The assets of the governmental entity are not accessible. The reverse is true in an official capacity lawsuit. Furthermore, "to establish personal liability in a § 1983

action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.... [I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* 473 U.S. at 166, 105 S. Ct. at 3105 (citations omitted).

*Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992) (emphasis added).

Therefore, any official capacity claims that Mr. Romine seeks to assert against Mayor Robinson and City Manager Hoyt are duplicative of his federal claims brought against the COA. Accordingly, the Rule 56 Motion is due to granted as to all official capacity federal claims asserted against Mayor Robinson and City Manager Hoyt.

### 2. Federal Claims Asserted Against Mayor Robinson and City Manager Hoyt In Their Personal Capacities

#### a. Race Discrimination Under § 1981

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).

The elements of a cause of action under § 1981 are: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (internal quotation marks omitted) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).

*Lopez v. Target Corp.*, 676 F.3d 1230, 1233 (11th Cir. 2012).

## There Is No Direct Evidence of Race Discrimination.

As a threshold matter, a plaintiff can establish the element of intentional discrimination through either direct, circumstantial, or statistical evidence.[14] *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004). Turning first to the category of direct evidence, Mr. Romine argues that he has presented one and, in doing so, relies upon the testimony of a <u>former</u> City Council member, Benjamin Little ("Mr. Little"). According to Mr. Little, "it's not unusual, but when it comes to black folk, we just go through extra hoops …." (Doc. 26-2 at 16 at 59).[15] Mr. Little further testified that he "said on the council repeatedly, I said now, I said today and I said tomorrow, Anniston has a problem with black folks." *Id.* Mr. Little also indicated that the City Council's discussions about what type of food Mr. Romine would be serving at his restaurant "reminded him of discriminatory comments made about the fare to be served at the Master[]s [the year] after Tiger Woods['s] [first] victory [there]." (Doc. 35 at 18 (citing Doc. 26-2 at 7 at 22)).

Mr. Romine contends that Mr. Little's statements constitute direct evidence of the discriminatory treatment of him. The court disagrees. As the Eleventh Circuit has

---

[14]  Statistical proof is not an issue in this case.

[15]  The first set of page references to Doc. 26-2 corresponds with the court's CM/ECF numbering system.

explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race], . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)).

Based upon this stringent standard and in the absence of <u>any</u> invidiously-charged utterances tied directly to the decision to terminate Mr. Romine's lease <u>and</u> which are attributable to those persons who played a role in that process (*i.e.*, City Manager Hoyt, Mayor Robinson, or any other <u>then sitting</u> City Council members), Mr. Romine's case is, at best, purely a circumstantial evidence one. *A fortiori*, there can be no direct evidence case of discrimination against Mayor Robinson or City Manager Hoyt individually in  the absence of proof showing decision-related racial bias directly attributable to <u>each</u> one of them.

## Circumstantial Evidence Fails To Show Race Discrimination.

The court, as a threshold matter, assumes without deciding, that Mr. Romine is able to utilize Title VII's (less demanding) *McDonnell Douglas* disparate treatment structure in an effort to establish his § 1981 race discrimination claim even though his case arises outside of the employment context. (*See* Doc. 27 at 13 (Defendants' suggesting that question of whether Title VII framework is applicable in a non-employment lawsuit arising under § 1981 is still undecided within the Eleventh

Circuit, but still analyzing Mr. Romine's race claims under both formats)); *see Brown v. American Honda Motor Co.*, 939 F.2d 946, 494 (11th Cir. 1991) (embracing use of Title VII circumstantial evidence model "for a federal race discrimination claim by a <u>non-employee</u> against a private company . . . under 42 U.S.C. § 1981" (emphasis added) (citing § 1981 <u>employment</u> decision in *Patterson v. McLean Credit Union*, 491 U.S. 164,  109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989))); *see also id.* ("The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes." (citing *Patterson*, 491 U.S. at 185-87, 109 S. Ct. at 2377-78)); *cf. Lincoln v. Board of Regents of University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When, as in this case, the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.").

The Eleventh Circuit has fashioned the Title VII test for a discriminatory discharge claim when a plaintiff, such as Mr. Romine, is relying primarily upon comparator evidence as follows:

> To establish a *prima facie* case of disparate treatment, Appellant must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1562

(11th Cir. 1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). . . .

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).[16]

Here, the focus of the parties' *prima facie* dispute is over satisfaction of the similarly situated prong. Mayor Robinson and City Manager Hoyt also maintain that Mr. Romine cannot demonstrate pretext. (Doc. 27 at 14-16).

As for purported comparator evidence, Mr. Romine contends that Mr. Gomez was not "required to provide any of the documents and qualifications as [he did]."

---

[16]   The court acknowledges that Mr. Romine (without any explanation, much less citation to any on-point persuasive authority) has proposed that the court follow a denial of contract model like the one used in *Brown v. Honda, supra*. (Doc. 35 at 19-20). However, because Mr. Romine was awarded the restaurant lease and subsequently lost it on account of contractual misconduct (*i.e.*, falling into default), the court finds that the *Maniccia* provides a much more appropriate framework.

(Doc. 35 at 23). However, Mr. Romine offers no proof to corroborate this point (much less to tie Mayor Robinson or City Manager Hoyt to this allegation) and, as the former Fifth Circuit has made clear, "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[17]

Further, the relevant comparator issue in this lawsuit is not disparate treatment in the awarding of a contract, but rather, in the ending of one due to a failure to meet certain contractual obligations as the lessee. As the Eleventh Circuit has explained regarding comparator evidence "[i]n determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the <u>same or similar conduct</u> and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added). Here, Mr. Gomez's lease was never involuntarily terminated because he was in default; instead, the record confirms that his lease was voluntarily assigned to Mr. LeCroy and Mr. Wilborn with the consent of the COA.

Mr. Romine further contrasts his qualifications with the two white purported comparators, Mr. LeCroy and Mr. Wilborn, who ran the restaurant in 2013, subsequent to Mr. Gomez's operation of it. Mr. Romine contends that because of his

---

[17]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

superior qualifications in running a restaurant as compared to that of Mr. LeCroy and Mr. Wilborn, a jury may infer a racially-driven animus in how he was treated by the COA in ending his lease in 2010. (Doc. 35 at 23-24). However, Mr. Romine's reliance upon Messrs. LeCroy and Wilborn as comparators misses the mark on account of a substantial remoteness in time. As pointed out above, Mr. Gomez, a Mexican American, was the person who directly replaced Mr. Romine under the restaurant lease, and he remained the lessee for approximately two years. Importantly, Mr. Romine offers no binding authority (and this court is not independently aware of any) that, when utilizing comparator evidence to circumstantially show race discrimination, a plaintiff may appropriately skip over his proximate-in-time comparator (Mr. Gomez) and instead rely upon comparators who are more remote in time (Messrs. LeCroy and Wilborn, the contractors to whom the lease was assigned to by Mr. Gomez approximately <u>two years</u> after the COA terminated Mr. Romine's lease).

Additionally, as it pertains to Mayor Robinson and City Manager Hoyt individually, the record does not even confirm that they were part of the decision-making group who recommended and/or approved the assignment of Mr. Gomez's lease to Messrs. LeCroy and Wilborn in 2013. *Cf. Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by

different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." (citing *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)). Finally, Mr. Romine, once again, mistakenly focuses upon the unfamiliarity of Messrs. LeCroy and Wilborn with working in the restaurant industry (and, therefore, urges that they are inadequate assignees under the lease as opposed to him), instead of the relevant comparator inquiry–have Messrs. LeCroy and Wilborn ever been in default under the assigned lease and, if so, how were they treated by Mayor Robinson and/or City Manager Hoyt under <u>those</u> similar circumstances?

Further, in the absence of pointing to a similarly-situated defaulted contractor, Mr. Romine has the burden of demonstrating that other pieces of proof can circumstantially show that race played a role in the termination of his contract. In an effort to do this, Mr. Romine points to the City Council's numerous delays in approving his contract (Doc. 35 at 20) as well as the absence of a formal vote by the City Council to end his lease. Mr. Romine additionally sets forth examples of how he attempted in good faith to meet all the September 1, 2010, deadlines included in the lease and faults City Manager Hoyt for not dealing with him fairly. (*Id.* at 21-22).

Mr. Romine also relies upon City Manager Hoyt's creation of what Mr. Romine calls a fraudulent amended lease (Doc. 34-2 at 62-77) that was purportedly executed on October 21, 2010 (but which Mr. Romine testified he did not sign) and

cites to City Manager Hoyt's deposition testimony in which he was unable to recall if Mr. Romine was present when it was signed. (*Id.* at 22-23; *see also* Doc. 26-1 at 59 ("Q. (BY MS. LYONS:) Were you present when the plaintiff signed that? A. I don't recall.")). Although Mr. Romine disputes the authenticity of his signature on this amended lease (and Defendants have stated in their facts that Mr. Romine did not sign it), Mr. Romine does not link this irregularity to his race or to the decision to end the original lease (which he concedes he signed).

Regarding Mr. Romine's reliance upon evidence tied to City Manager Hoyt generally, reading the record in a light most favorable to the plaintiff, Mr. Romine has raised several issues which cast doubt upon City Manager Hoyt's willingness to fully cooperate with him or always deal with him reasonably under the lease. However, Mr. Romine has not sufficiently connected that questionable treatment to his race. *Cf. Hawkins v. Ceco Corp.*, 883 F.2d 977, 986 (11th Cir. 1989) ("Hawkins presented evidence that Rascoe did not like him, but a dislike alone is not evidence of racial discrimination.").

Furthermore, Mr. Romine's other evidence to sustain an inference of discrimination is not nearly as compelling as that in cases in which the Eleventh Circuit found "other evidence" sufficient. In *Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. 2008), the plaintiff, a white male deputy fire chief, was demoted. Although

he lacked a suitable comparator, the Eleventh Circuit found that the plaintiff nevertheless still established a *prima facie* case of race discrimination in light of the plethora of other <u>race-related</u> circumstances that he faced.

In Rioux's view, the district court improperly discounted the following evidence from which an inference of discrimination could be found: (1) Rubin tried to maintain <u>a racial balance</u> at the AFD, maintaining <u>a race tracking spreadsheet of personnel decisions</u>, including Rioux's, that he regularly presented to his political superiors; (2) Rubin had discussions with Atlanta City Councilman, Ivory Lee Young, Jr. ("Councilman Young"), in which Rubin reviewed the spreadsheet and expressed his desire to achieve <u>a particular racial balance of 50/50 black/white</u> among the AFD discretionary ranks; (3) Rubin's "short list" of candidates to replace Rioux contained <u>three black firefighters</u>, and Rubin attempted to recruit <u>a black officer-Williams-to replace Rioux</u>; (4) Rubin felt pressure from the <u>AFD black power structure to harshly discipline Rioux</u>, amidst allegations from the Brothers Combined that Rubin would favor Rioux following earlier and harsh treatment Rubin had given to Grissom, <u>a black chief accused of taking bribes</u> (treatment the Brothers Combined had been critical of); (5) Rioux's aggressive response to the AFD's delayed arrival at the May 2, 2004 fire was prompted by Rubin himself, who had told Rioux the Fire Investigation Unit needed to respond more quickly to fires; (6) an inference could be drawn that Austin was goaded into filing the grievance against Rioux by members of the Brothers Combined; (7) the differences in manner and degree of investigating the Rioux incident as compared to the incident involving proposed comparator Dunham [an <u>African American</u> male]; and (8) evidence showing Dunham was a discretionary officer subject to the same rules and supervisor-Rubin-as Rioux, <u>who committed a similar offense to Rioux's but who was treated differently with respect to the investigation of the incident and disciplinary action taken thereafter</u>.

The foregoing categories of evidence, combined with Rioux satisfying the *Sturniolo* and *Hinson prima facie* test for discriminatory

demotion, lead us to conclude that Rioux satisfied his *prima facie* showing under *McDonnell Douglas*.

*Rioux*, 520 F.3d at 1277 (emphasis added).[18]

In another published decision, subsequent to and expressly relying upon *Rioux*, the Eleventh Circuit again found that the absence of a similarly situated supervisory comparator was not a fatal defect in the context of a workplace misconduct/discriminatory discharge claim brought by a white supervisor, summarizing:

> The foregoing circumstantial facts preclude summary judgment in this case as a jury reasonably could infer that Lockheed only fired Mitten because he is white. The evidence yields this inference because it: (1) suggests that Lockheed's justification for firing Mitten is a pretext for racial animus; (2) shows that Lockheed had a <u>substantial incentive</u>

---

[18]   As the Eleventh Circuit explained the other *prima facie* models discussed in *Rioux*:

> Another formulation of a *prima facie* case, however, has been articulated in cases raising claims of discrimination where a plaintiff is demoted, and it is this other formulation that the district court applied and that Appellant asserts he satisfied. The district court applied the *prima facie* test for discriminatory demotion from *Sturniolo v. Sheaffer, Eaton, Inc.*, which differs from the test articulated by Appellants in that it requires the plaintiff to demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he was demoted; and (4) following the demotion he was replaced by someone outside his protected class. 15 F.3d 1023, 1025 (11th Cir. 1994); *see also Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000) (applying same standard in case involving teacher claiming discriminatory demotion). In *Sturniolo* and *Hinson*, <u>the demotions were unrelated to any claimed discipline or discipline more severe than that received by others similarly situated. In *Sturniolo* and *Hinson*, unlike in the present case, there was no claim that a similarly situated employee had committed a similar violation of work rules, but had been treated more favorably than the plaintiffs.</u>

*Rioux*, 520 F.3d at 1276 (emphasis added).

to discipline white employees more harshly than black employees in the summer of 2005; and (3) indicates clearly that Lockheed consciously injected race considerations into its discipline decision making [by way of a matrix] without an adequate explanation for doing so.

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 (11th Cir. 2011).

In contrast to *Rioux* and *Smith*, the race-related pieces of evidence relied upon by Mr. Romine (other than his non-black replacement under the lease, Mr. Gomez)[19] are more substantially distant from the decision-making process and are limited to: (i) the generalized comments made by Mr. Little concerning his perception that the City Council had a problem with black people when he was a member; (ii) Mr. Little's observation that the current City Council's discussions about what food Mr. Romine would be serving at the restaurant reminded him of the Tiger Woods/Masters

---

[19] An alternative way for an employment discrimination plaintiff to prima facially show discriminatory discharge within the Eleventh Circuit is:

(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.

*Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (emphasis added); *see also Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982) ("If plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained, then plaintiff has established a '*prima facie* case' of discrimination."). Mr. Romine meets the "replaced by a person outside his protected class" element. To the extent that *Maynard* and *Lee* mean that *Rioux* is inapplicable to the court's *prima facie* assessment, summary judgment in favor of Mayor Robinson and City Manager Hoyt in their individual capacities is still appropriate for several other independent reasons (*i.e.*, the absence of adequate pretext and the defense of qualified immunity) that are addressed *infra*.

controversy; and (iii) Mr. Romine's indication, in his brief, that "he was informed of several racist remarks made by City Council members." (Doc. 35 at 8 ¶ 39).

Concerning Mr. Little's testimony, his statements amount to stray comments as they were not uttered by or otherwise attributable to a relevant decisionmaker and because the record lacks any evidence that Mr. Little influenced the decisionmaking process which impacted Mr. Romine. As recently reasoned by the Eleventh Circuit in an unpublished opinion:

> Barsorian's only remaining argument concerns Buckner's remark about refreshing the IT department and Mr. Roth's alleged statement that firing Barsorian was not his call. This argument is flawed. First, as Barsorian conceded, he has no evidence that Buckner's statement about the need to "refresh the IT department" referred to the IT department's lone employee, Barsorian, or an update to the technology itself. In light of the technological problems that Grossman Roth was having, Buckner's statement could have referred to the technology and not to Barsorian. Second, even if Buckner's statement meant that the IT department's personnel needed to be refreshed, his use of the word refresh does not in itself suggest an age-based animus. *See Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 469–70 (7th Cir. 2000) (concluding that the statement "refresh the officer pool" did not suggest a preference for younger employees but instead referred to corporate behavior).

> [Further], Barsorian has presented no evidence that Buckner was the one who made the decision to fire him or influenced it. To the contrary, Mr. Roth testified that Buckner had no influence on the decision to fire Barsorian, and even Barsorian admitted that Mr. Roth, as managing partner, had final decisionmaking power over him. Thus, even if Buckner's comment related to Barsorian's age, it would not be enough to create a genuine issue of fact precluding summary judgment. *See Alvarez v. Royal Atlantic Developers*, 610 F.3d 1253, 1267–68 (11th

Cir. 2010) (<u>holding that a single stray remark from a non-decisionmaker that "Cubans are dumb" was not enough to raise a genuine fact issue</u>); *Standard*, 161 F.3d at 1329–30 (<u>statement that "older people have more go wrong" did not raise a genuine issue of fact because the statement was too vague and because it was uttered by someone who was not involved in the decision to terminate the plaintiff</u>); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir.1987) (<u>vice president's statement that the corporation was "going to weed out the old ones" did not preclude summary judgment where the vice president played no part in the decision to fire the plaintiff</u>). Because there is no evidence that Buckner influenced the decision to fire Barsorian, Buckner's statement does not create a genuine issue of fact requiring trial.

*Barsorian v. Grossman Roth, P.A.*, No. 13–14156, 2014 WL 3608511, at *6 (11th Cir. July 23, 2014) (emphasis added).

*Barsorian*, in conjunction with the published Eleventh Circuit authorities upon which it relies, firmly establish that Mr. Little's testimony does not salvage Mr. Romine's *prima facie* case against Mayor Robinson or City Manager Hoyt under the type of *prima facie* variation permitted in *Rioux* or the no reliance upon *McDonnell Douglas* option in *Smith*. *See Smith*, 644 F.3d at 1328 ("Here, Mitten did not need to rely on the *McDonnell Douglas* presumption to establish a case for the jury. . . . [because] the record contained sufficient evidence to allow a jury to infer that Lockheed fired Mitten because he is white.").

Similarly, Mr. Romine's testimony about a white friend named James Howard who told him that "we're not going to let no niggers come out there and run the

business" (Doc. 26-3 at 24 at 89) is unconnected to Mayor Robinson, City Manager Hoyt, or to anyone working for the COA for that matter. (*Id.* at 90 ("Q. -- does James Howard work for the City of Anniston? A. No, sir.")).[20] Consequently, that evidence is also unavailing as "other evidence" to show the existence of a *prima facie* case of race discrimination against Mayor Robinson or City Manager Hoyt under the *Rioux* model or to overcome any need to rely upon the *McDonnell Douglas* presumption under the *Smith* formulation.

## The Evidence Also Fails To Show Pretext.

Alternatively, assuming further that it is appropriate to evaluate Mr. Romine's *prima facie* case under the less exacting test applicable to employment discrimination claims as set out in *Maynard* and *Lee* (referenced in n.19, *supra*), his claim nevertheless still fails due to his insufficient proof of pretext–the absence of sufficient evidence which supports a <u>reasonable</u> inference that <u>race</u> played a role in Mayor

---

[20]   Mr. Romine also mentions that a girl "in the back" overheard "Mr. Spain" stating that "we'll let y'all blacks come out here - - we'll let them blacks come out here and work" but he had a problem with blacks "coming out here and running this place." (Doc. 26-3 at 23-24 at 88-89). The undersigned takes judicial notice of the fact that in November 2008 John Spain was elected as a member of COA's City Council and was still on the City Council when Mr. Romine's lease ended. Consequently, it appears to the court that this racially-charged excerpt from Mr. Romine's deposition testimony does pertain to a member of the City Council who (through its inaction) ratified City Manager Hoyt's decision to terminate Mr. Romine's lease. Nevertheless, assuming the admissibility of this testimony, a racist statement attributable Mr. Spain about the restaurant lease does not create a triable issue regarding the individual liability of either Mayor Robinson or City Manager Hoyt under § 1981.

Robinson and/or City Manager Hoyt's adverse treatment of Mr. Romine under the lease. *See, e.g., Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) ("[E]vidence [of pretext] must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.").

As the Supreme Court has clarified, "[a]lthough intermediate evidentiary burdens shift back and forth under th[e] [*McDonnell Douglas*] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (emphasis added) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981))); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984) ("A Title VII disparate treatment plaintiff must prove that the defendant acted with discriminatory purpose." (citing *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529 (11th Cir. 1983))).

In particular, the Supreme Court observed in *Reeves* that evaluating the triable nature of a race discrimination claim will oftentimes be a factor-intensive inquiry:

Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, <u>or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred</u>. *See Aka v. Washington Hospital Center*, 156 F.3d, at 1291–1292; *see also Fisher v. Vassar College*, 114 F.3d, at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent"). To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'" *St. Mary's Honor Center, supra*, at 524, 113 S. Ct. 2742 (quoting *Aikens*, 460 U.S., at 716, 103 S. Ct. 1478).

<u>Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors</u>. Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves*, 530 U.S. at 148-49, 120 S. Ct. at 2109 (emphasis by underlining added).

Here, Mayor Robinson and City Manager Hoyt have articulated a legitimate,

non-discriminatory reason for terminating the restaurant lease–Mr. Romine's noncompliance with multiple provisions of the contract which he entered into with the COA voluntarily. While Mr. Romine has offered <u>some</u> excuses for why he was not in compliance with <u>some</u> of the lease's terms or why it took him longer than expected to comply with <u>some</u> of the lease's terms, he has not refuted the explanation for ending the restaurant lease because of his defaulted status, as of September 1, 2010, head-on. *See, e.g., Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("The plaintiff <u>must</u> meet the reason proffered head on and rebut it.") (emphasis added). Instead, Mr. Romine's tenuous position seems to be that Mayor Robinson and City Manager Hoyt had an ongoing obligation to accept his contractual excuses indefinitely, and that their unwillingness to do so constitutes a pretext for racial discrimination.

Additionally, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether <u>each</u> of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (emphasis added) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997)). Here, summary judgment is appropriate because Mr. Romine has failed to create a genuine material fact over defaulting him on November 4, 2010, when he

had already been given over 30 days from the execution of the lease to come into compliance with all of its voluntarily-agreed-to terms, including the deadline of September 1, 2010.[21]

Mr. Romine also has not alternatively shown that Mayor Robinson and/or City Manager Hoyt treated other similarly situated non-black contractors more favorably, even though they, like him, fell into default under their contracts with the COA (*e.g.*, Mayor Robinson and/or City Manager Hoyt accepted those comparators' excuses for being in breach and retained them as contractors for the COA). Because Mr. Romine has insufficient comparator evidence and the overall strength of his *prima facie* case and other proof of pretext is so weak, the record, with respect to his § 1981 race discrimination claim against Mayor Robinson and City Manager Hoyt, lacks "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions'" *MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998)); *cf. Smith*, 644 F.3d at 1328 ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence

---

[21] To the extent that Mr. Romine has complained that he did not have access to the building and that he received little cooperation for COA workers, he has only arguably linked this problem to his non-compliance with one of the lease's provisions (*i.e.*, being open for business).

that would allow a jury to infer intentional discrimination by the decision maker.'"

(footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir.

2011))). Thus, summary judgment in favor of Mayor Robinson and City Manager

Hoyt in their individual capacities is independently appropriate when evaluating the

pretext prong.

### b.     Equal Protection Claim

As the Eleventh Circuit has summarized the scope of protections afforded by

the Equal Protection Clause:

> [T]he Equal Protection Clause requires government entities to treat
> similarly situated people alike. Equal protection claims are not limited
> to individuals discriminated against based on their membership in a
> vulnerable class. Rather, we have recognized any individual's right to
> be free from intentional discrimination at the hands of government
> officials.

*Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) (citing *E&T Realty*

*v. Strickland*, 830 F.2d 1107, 1112 (11th Cir. 1987)). Procedurally, an equal

protection claim is brought through § 1983. *See Bush v. Houston County Com'n*, 414

F. App'x 264, 266 (11th Cir. 2011) ("Section 1983 is a vehicle for bringing civil

lawsuits that 'provides every person with the right to sue those acting under color of

state law for violations of federal constitutional and statutory provisions.'" (quoting

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1299 (11th Cir.

38

2007))).

Here, Mr. Romine contends that Mayor Robinson and City Manager Hoyt have violated the Equal Protection Clause because the decision to end his restaurant lease was motivated by his race. To support his Equal Protection Clause claim, Mr. Romine relies upon the same body of evidence and arguments which he contends are sufficient to establish the triable nature of his § 1981 race claim. Because Mr. Romine's Equal Protection Clause claim resembles his § 1981 one, summary judgment in favor of Mayor Robinson and City Manager Hoyt is appropriate for all those reasons explained in section IV.A.2.a. above. *Cf. Bush*, 414 F. App'x at 266 ("In the employment context, §§ 1981 and 1983 claims require the same elements of proof and involve the same analytical framework as Title VII claims." (citing *Rice–Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000))).

### c.    Procedural Due Process

In opposing summary judgment, Mr. Romine describes the nature of his procedural due process claim:

> Plaintiff was denied the right to perform the contract with the City of Anniston. Despite his being ready to perform and having a contract in place, the City deprived him if his right to perform the contract.

(Doc. 35 at 27). Here the court determines that Mr. Romine at least arguably had a property interest in the restaurant lease because the contract lacks a "without cause"

termination provision. *Cf. Economic Development Corp. of Dade County, Inc. v. Stierheim*, 782 F.2d 952, 954 (11th Cir. 1986) ("Under this simple test EDCO did not possess a property interest in its contract with the county. EDCO admits that the contract allowed the county to terminate the agreement at its convenience, *i.e.*, without cause.").

Even so, Mr. Romine cannot maintain a procedural due process violation because he has not alleged, nor can he show, that Alabama law leaves him without an adequate remedy in state court. As the Eleventh Circuit explained in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994):

> [D]ue process is satisfied when the challenger has an opportunity to present his allegations and to demonstrate the alleged bias. A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process. As we mention above, unlike substantive due process violations, procedural due process violations do not become complete "unless and until the state refuses to provide due process." *Zinermon*, 494 U.S. at 123, 110 S. Ct. at 983. More specifically, in the case of an employment termination case, "due process [does not] require the state to provide an impartial decisionmaker at the pre-termination hearing. The state is obligated only to make available 'the means by which [the employee] can receive redress for the deprivations.'" *Schaper v. City of Huntsville*, 813 F.2d 709, 715–16 (5th Cir. 1987) (quoting *Parratt v. Taylor*, 451 U.S. 527, 543, 101 S. Ct. 1908, 1917, 68 L. Ed. 2d 420 (1981)) (footnote omitted).
>
> In *Parratt* (and its progeny, *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)), the Supreme Court held that due process did not require pre-deprivation hearings where the holding of

40

such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or an intentional deprivation of property. All that due process requires, the Court said, is a post-deprivation "means of redress for property deprivations satisfy[ing] the requirements of procedural due process." *Parratt*, 451 U.S. at 537, 101 S. Ct. at 1914; *accord Hudson*, 468 U.S. at 533, 104 S. Ct. at 3204.

The precedent established by *Parratt* is unambiguous: even if McKinney suffered a procedural deprivation at the hands of a biased Board at his termination hearing, <u>he has not suffered a violation of his procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation</u>. As <u>any bias on the part of the Board was not sanctioned by the state</u> and was the product of the intentional acts of the commissioners, under *Parratt*, only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation. It is to an examination of this state remedy—and a determination of whether it satisfies due process—that we now turn.

In this case, McKinney failed to take advantage of any state remedies, opting instead to pursue his claim in federal court. In his en banc brief, McKinney asserts that the state remedy—review by Florida courts—is insufficient, largely because the statute of limitations for certiorari petitions of termination cases is significantly shorter than that for torts. McKinney also states that the state court procedure is deficient because the Florida courts' power to review is limited to the record before the Board. <u>We disagree with McKinney's conclusion that Florida's process is inadequate</u>.

*McKinney*, 20 F.3d at 1562-63 (footnote omitted) (emphasis added).

While *McKinney* involves a plaintiff challenging an employment termination,

no reason exists for dealing with a non-employment contract termination differently.

*See Stierheim*, 782 F.2d at 953 (referencing district court's holding under *Parratt* that

41

"there had been no denial of due process because Florida law provided EDCO with an adequate remedy in state court" to address contractual interest, but ultimately upholding decision on different grounds).

Additionally, as the Eleventh Circuit has observed:

> The *McKinney* rule is not micro in its focus, but macro. It does not look to the actual involvement of state courts or whether they were asked to provide a remedy in the specific case now before the federal court. Instead, the *McKinney* rule looks to the existence of an opportunity-to whether the state courts, if asked, generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered. If state courts would, then there is no federal procedural due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so. If state courts generally would not provide an adequate remedy for that type of procedural deprivation, then the federal court determines whether the Fourteenth Amendment Due Process Clause requires such a remedy, and if it does, the federal court remedies the violation. Either way, the federal court decides the federal procedural due process claim; that claim is not sent back to state court.

*Horton v. Board of County Com'rs of Flagler County*, 202 F.3d 1297, 1300 (11th Cir. 2000) (emphasis added).

Therefore, akin to *McKinney* and *Horton*, Mr. Romine has no viable procedural due process claim because he has not asserted (much less shown) that Alabama "refuses to make available a means to remedy the deprivation." *McKinney*, 20 F.3d at 1563; *see also id.* at 1557 ("In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to

provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.").

### d.   Qualified Immunity

Alternatively, qualified immunity protects Mayor Robinson and City Manager Hoyt to the extent that Mr. Romine has established any triable constitutional issues against them in their individual capacities. Mr. Romine's lawsuit undoubtedly challenges Mayor Robinson and City Manager Hoyt's discretionary authority as public officials, which marks the first level of the qualified immunity analysis.

Turning to the next inquiry, Mr. Romine has not carried his burden of demonstrating how either one of them has violated clearly established law in carrying out their discretionary functions. *See Santamorena v. Georgia Military College*, 147 F.3d 1337, 1340 (11th Cir. 1998) ("To overcome this immunity, Plaintiff has the burden of pointing to case law which 'pre-date[s] the offic[ial]'s alleged improper conduct, involve[s] materially similar facts, and 'truly compel[s]' the conclusion that the plaintiff had a right under federal law.'" (quoting *Ensley v. Soper*, 142 F.3d 1402, 1406 (11th Cir. 1998))).

In particular, Mr. Romine makes no effort to address each one of his federal claims and has not offered any binding authority which concretely establishes the unlawfulness of Mayor Robinson and City Manager Hoyt's actions prior to when they

occurred. Instead, Mr. Romine merely nominally addresses qualified immunity, citing only to *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), and *Anderson, supra*, for general propositions pertaining to the defense.

Concerning race discrimination, while this court is aware that "[i]t is beyond doubt that the principal right allegedly violated by [Mayor Robinson and City Manager Hoyt]—the equal protection right to be free from intentional racial discrimination—was clearly established at the time [Mr. Romine's lease was ended,]" *see Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991), the Eleventh Circuit has also made it equally clear that public officials "can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs <u>and still act lawfully</u> . . . ." *Rioux*, 520 F.3d at 1283 (internal quotation marks omitted) (emphasis added) (quoting *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996).

More specifically, under *Foy*, "state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent." 94 F.3d at 1534. Because Mayor Robinson and City Manager Hoyt had adequate lawful reasons for terminating Mr. Romine's lease unrelated to his race and the record does not plainly show that the illegal criterion of race motivated their conduct, they are entitled to qualified

immunity on Mr. Romine's race-related claims pursuant to *Foy*. *See Foy*, 94 F.3d at 1534 ("Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct-despite his having adequate lawful reasons to support the act-was the result of his unlawful motive, the defendant is entitled to immunity.").

Furthermore, as it pertains to Mayor Robinson, Mr. Romine faces an additional qualified immunity hurdle. Mr. Romine has failed to factually develop <u>any</u> specific wrongdoing on his part other than to simply state that he "was aware of Hoyt's actions in relation to the contract" and that he "did nothing to re[s]cind Hoyt's actions" (Doc. 35 at 29), much less to meet his requisite legal burden in opposing the invocation of a qualified immunity defense. Thus, it appears to the court that Mr. Romine theorizes that Mayor Robinson is potentially liable to him in his capacity as City Manager Hoyt's supervisor.

As the Eleventh Circuit has made clear regarding qualified immunity in the context of supervisory liability under § 1983:

> Johnston's liability under § 1983 as Carroll's supervisor must be based on something more than the theory of *respondeat superior*. *Braddy v. Florida Dep't. of Labor and Employment Security*, 133 F.3d 797, 801 (11th Cir. 1998). In *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990), we observed that
>
> Supervisor liability occurs either when the supervisor

personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

906 F.2d at 671 (citations omitted)

*Crawford v. Carroll*, 529 F.3d 961, 978 (11th Cir. 2008). Mr. Romine has made no

effort to meet this supervisory standard or to otherwise advance another applicable

theory that would entitle him to pursue Mayor Robinson individually and, as a result,

has abandoned his opposition to Mayor Robinson's qualified immunity defense. *See,*

*e.g., Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995)

("[T]he onus is upon the parties to formulate arguments; grounds alleged in the

complaint but not relied upon in summary judgment are deemed abandoned." (citing

*Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563,

1568 (11th Cir. 1994))); *Coalition for the Abolition of Marijuana Prohibition v. City*

*of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at

the district court is sufficient to find the issue has been abandoned); *Wilkerson v.*

*Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when

46

argument not presented in initial response to motion for summary judgment).

Finally, the far from extreme nature of Mr. Romine's federal claims means that this dispute does not fall within that extraordinary class of so-called "obvious clarity" cases in which no preexisting binding authority is necessary to provide a public official with fair warning of his unconstitutional behavior. *See Santamorena*, 147 F.3d at 1340 n.6 ("[T]hese exceptional cases <u>rarely</u> arise.") (emphasis added); *cf. Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant officer's <u>acts are so egregious</u> that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment.") (emphasis added).

While Mr. Romine contends that his case does properly belong within this highly uncommon category (Doc. 35 at 29), he does so perfunctorily and without offering any on-point support. *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before

the court). Thus, for these numerous reasons, qualified immunity, provides an independent basis for granting summary judgment in favor of Mayor Robinson and City Manager Hoyt on Mr. Romine's federal claims brought against them individually.

### 3.    Mr. Romine's Federal Claims Against COA

As set forth in Defendants' Rule 56 Motion, Mr. Romine's federal claims brought under § 1983 against the COA are governed by the rules established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658,  98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In order for the COA to be subjected to § 1983 liability, *Monell* requires that Mr. Romine prove, at a minimum:   (1) that the individual defendants' actions were unconstitutional; and (2) that a municipal "policy" or "custom" of the COA caused these violations to occur. *Id.* at 694-95, 98 S. Ct. 2037-38.

Based upon the *Monell* doctrine, summary judgment in favor of the COA on Mr. Romine's federal claims is appropriate because as analyzed above, Mr. Romine has no viable cause of action under § 1981, the Equal Protection Clause, or the Due Process Clause against either Mayor Robinson or City Manager Hoyt. Alternatively, to the extent that Mr. Romine has established a triable federal claim, the COA is still entitled to summary judgment because Mr. Romine has not causally connected the

federal violation to municipal action.

As Mr. Romine recognizes in his opposition brief,

Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985) (footnote omitted) (emphasis added).

Here, there is no evidence of an official COA policy or custom embracing race discrimination or due process violations in the handling of public contracts. Further, the only proof that Mr. Romine points to in an effort to show that his situation is not an isolated one is the vague testimony from former City Council member, Mr. Little, that "Anniston has a problem with black folks," that the COA has been involved in other litigation over "botched" contracts with black contractors, and that black citizens are forced to "go through extra hoops" in their dealings with the COA. (Doc. 35 at 28). Assuming the admissibility of this evidence, these sweeping, non-specific opinions offered by Mr. Little are simply inadequate proof for a reasonable jury to

conclude that the COA has a policy or custom to such a degree that appropriately exposes it to liability for the (assumed in the alternative) unconstitutional conduct committed by its public officials.

### B.   Mr. Romine's State Law Count

Count Three of Mr. Romine's complaint for breach of contract is also subject to dismissal on summary judgment. As Mr. Romine correctly recognizes in his opposition brief, an ordinary breach of contract claim arising under Alabama law requires proof of the following elements:

> (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.

*Southern Medical Health Systems, Inc. v. Vaughan*, 669 So.2d 98, 99 (Ala. 1995) (citing *McGinney v. Jackson*, 575 So.2d 1070, 1071-72 (Ala. 1991)).

In seeking summary judgment on Count Three, Defendants raise several viable grounds including:  (1) the non-binding nature of the lease on Mayor Robinson and City Manager Hoyt as individuals (Doc. 27 at 20-21); (2) Mr. Romine's admitted defaulted status (*i.e.*, his own <u>non</u>-performance) under the contract despite receiving additional time in which to come into compliance with its terms (*id.* at 21-25); and (3) the COA's right to terminate the lease given Mr. Romine's material breach. (*Id.* at 25-26).

Mr. Romine makes no attempt to refute Defendants' evidence or arguments which all solidly demonstrate their entitlement to summary judgment on this claim. Instead, Mr. Romine minimally and ineffectually asserts:

> A lease/contract was signed on August 24, 2010. Plaintiff did everything he was instructed to do in preparation of performance. The Defendant defaulted Plaintiff despite his being ready to perform and Plaintiff has been denied the opportunity to operate the business and make a profit since 2010. Defendants['] summary judgment [motion] is due to be denied.

(Doc. 35 at 30).

Mr. Romine's woefully underdeveloped response essentially constitutes an abandonment of his breach of contract claim. More importantly, his attempted opposition creates no triable contractual issue. Therefore, the court will enter an order that also dismisses Count Three of Mr. Romine's complaint with prejudice.

## Mr. Romine's Strike Motion

Mr. Romine's Strike Motion challenges Defendants' reliance upon a memo from Mr. Folks to the Mayor and City Council dated August 17, 2011, indicating that Mr. Gomez (and Debra Gomez) were "awarded the opportunity to lease the Cane Creek Restaurant." (Doc. 26-10 at 2). Because summary judgment is appropriate on all of Mr. Romine's claims with or without consideration of this memo, the Strike Motion is due to be termed as moot.

## V.    CONCLUSION

For the reasons stated above, Defendants' Rule 56 Motion is due to be granted, and Mr. Romine's complaint is due to be dismissed with prejudice. Further, Mr. Romine's Strike Motion is due to be termed as moot. Finally, the court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this 2nd day of October, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge